26479. INGRAM *et al. v.* SMITH.

DECIDED MARCH 10, 1938.

*Claude Christopher, George W. Garrett, Morgan S. Cantey,* for plaintiff.

*W. J. Wallace,* for defendant.

GUERRY, J. O. W. and O. B. Ingram filed suit against E. H. Smith, alleging that they were the owners of the following described real property: "All that tract or parcel of land lying or being in the County of Monroe and the said State of Georgia. Three hundred acres of land in Cox's District, beginning at a point directly in front of the residence formerly occupied by A. J. Zellner, said point being in the center of the road; thence east 19.15 chains; thence south 45 chains; thence west 54.15 chains; thence north 10 chains; thence west 9 chains; thence north 35 chains; thence east 29 chains; thence north 16 chains; thence east 15 chains; thence south 16 chains to the beginning point. The said

lands are bounded on the north by Feagin Zellner and Mrs. C. F. Turner; south and east by lands of A. J. Zellner; west by A. J. Zellner and Mrs. M. J. Huguley's children." It was alleged that in May and June, 1936, the defendant entered upon this property and willfully cut and carried therefrom 620 pine trees of the value of $450, which he converted to his own use, and that he refused to deliver the property to the plaintiffs or to pay them the value thereof. The trial resulted in a verdict for the defendant, and the plaintiffs except to the overruling of their motion for new trial.

It appears from the evidence that Mr. Willingham was the owner of the land on the east and south of the lands of plaintiff, and that he sold the timber on his land to the defendant, Smith. The land lines between these adjoining properties were not marked by fences, and on the east of the above-described property the line was all in woods. On the trial the sole questions were, (1) as to the location of the land lines separating the two tracts on the east and south of the above described property, and (2) whether the plaintiffs by their conduct had estopped themselves from claiming the trees cut by the defendant. The timber was cut in May and June, 1936. On May 25 the plaintiffs wrote to the defendant as follows: "Jerry Zellner states that you wish me to come and try to show you the land line between the Willingham land and mine. I am very busy; and even tho I came, I have no compass and could not run the line through the woods. The northeast and southeast corners are very plain, and can be shown you by Jerry; and if you will get county surveyor and start at one of these corners, having Jerry to mark this line as it is run, you will know just where to cut to. This is the only way that it can be done accurately. We do not want a tree cut off our land, and do not feel that the burden is on us to go to any expense of time and money to protect it. You probably want every tree that you bought from Mr. Willingham; and we think the burden is on you to go to the necessary expense to employ surveyor to run this line, so that you may know just where to cut. If you cut the Willingham timber on the south side of the place, the surveyor could set up at the iron stake on the southeast corner of our land and run due west, which will show you this line, and Jerry can mark same. Whatever you do, please do not cut any of our timber. If you will arrange for surveyor I will try to meet him there; however, I do not think it necessary

that I be there, as the corners and most especially the southeast corner of our land is well established, and surveyor can run both lines from this corner. It is not our position to be contentious and mean, but we know that you do not feel that you have to stand over your pile of lumber to keep any one from bothering it, as it is yours. We do not feel that it is necessary that we go to any expense to keep any one from cutting our timber, as we are peacefully in possession of the same. Thanking you in advance for your caution in this matter, and assuring you that I do not think that you would intentionally cut any of our timber, but we do not want it cut through error or otherwise. Yours truly." On June 22, 1936, plaintiffs wrote to defendant as follows: "I am disappointed beyond repair. After sending you word many times by Jerry Zellner, asking you not to cut any of our timber, and my letter to you of May 25th, telling you just what could be done to avoid this, yet I find that you have cut across the line on the east side of the place, and you have made at least two or more sawmill sites on our land on the south side of the place. It would have been such an easy matter for you to have gotten the description of the Willingham land and our land from the clerk's office, and had the surveyor to have run these lines and avoided cutting our timber. This timber was not for sale. Yet by your failure to observe proper precaution you have cut it regardless. It will be necessary that you take immediate action toward adjustment. We do not demand that you accept the line as surveyed to-day. While there was only slight variations from the following description: [Here follows same description of land above set out.] In surveying this southern boundary there was practically no variation or less than half chain in the survey. I am attaching plat and showing where you have cut our timber. Yours truly."

All of the parties are in agreement as to the southeast corner of Ingram's property. So far as it appears from the evidence, the only communications which took place directly between Ingram and Smith were the letters quoted above. Mr. Smith testified that he never procured a surveyor to run the lines before or since he cut the timber. He stated that Jerry Zellner pointed out to him the northeast corner of the land, and that they blazed a line from that corner pointed out by Jerry Zellner to the southeast corner. He also stated that Jerry Zellner told him that Mr. Ingram had told

him (Zellner) to point out the lines. After the timber was cut, Mr. Willingham and Mr. Ingram employed a surveyor to run the lines around the land as described in the deed under which the Ingrams held; and according to this survey and measurement the northeast corner was not at the point pointed out by Zellner to Smith, but was 8.54 chains further east. There is no dispute that such survey was in conformity to the description contained in the deed as being 19.15 chains east from an established starting point. The surveyor's plat and testimony show, without contradiction, that the southern boundary line was as claimed by the plaintiffs, taking into consideration the offset in the property in the southwest corner thereof. Smith stated that Zellner showed him the lines and that he cut timber within the lines pointed out to him by Zellner. Zellner testified that he had lived on the land all of his life, that he remembered when the predecessors in title to the Ingrams had bought the land, and that he helped the surveyors at the time. He pointed out in the road east of his house a point where an iron stob had been located, which place he pointed out to Smith as the northeast corner of the land. He testified: "Mr. Ingram wrote me a letter and told me to see that he (Mr. Smith) did not cut any timber on his side and to show him the corners of his place; and I went and showed him the corners the best I knowed how. Mr. Ingram told me that, and then he wrote me. . . Mr. Ingram saw me several times, and kept warning me and telling me to tell them not to cut any of his timber. I went up to his house and I said 'Mr. Ingram you come down yonder, and you and Mr. Smith come down yonder and get that straight;' and he replied to me and said he didn't have time—for me to go back and tell him to stay over on his side. Well, I told him just what he said." Zellner testified also that he did not remember that the stob in the northeast corner which he pointed out to Smith was put up there at the time Ingram's predecessors in title bought the land.

We think the evidence demanded a finding that a certain number of trees were cut by Smith from the lands of the plaintiffs; and the entire question to be passed upon is as to whether Jerry Zellner had authority to bind the plaintiffs, and whether the plaintiffs were bound by the representations of Zellner in reference to the location of the land lines between the land of Willingham and

442

their land. The judge charged the jury as follows: "If Ingram designated a particular man, who was to point out the line to Smith, and that man pointed out the line to Smith, and Smith did not go over the line which the old darky—I forgot his name —did not go over the line pointed out by the darky designated by Ingram, Ingram would be estopped from claiming anything over the line or within the line pointed out by the old negro who has testified here. He would be estopped, after having designated an agent to fix the line, from going back on that designation."

"The doctrine of equitable estoppel is frequently applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced or of which he has accepted any benefit. . . There must have been either an intention to deceive, or such gross negligence as to amount to constructive fraud, or admissions, declaration, or conduct intended or calculated, or such as might reasonably have been expected, to influence the conduct of the other party. . . Nor is there any estoppel when the other party had notice or knowledge of the facts, or when the matters were equally known to both parties or the means of knowledge were equally open. To have the benefit of an estoppel a person must show good faith and diligence to learn the truth." 10 R. C. L. 692, 694, 696. The Code, § 38-115 declares: "Where the estoppel relates to the title to real estate, the party claiming to have been influenced by the other's acts or declarations must not only be ignorant of the true title, but also of any convenient means of acquiring such knowledge. Where both parties have equal knowledge or equal means of obtaining the truth, there shall be no estoppel." This section was codified from the case of *Wilkins* v. *McGehee*, 86 *Ga.* 764 (13 S. E. 84); and while that decision relates to a purported estoppel by conduct at a sale, we think it equally applicable to the facts of the present case. The plaintiffs wrote to the defendant, before he cut the timber, to have the land surveyed, and that "most especially the southeast corner of our land is well established, and the surveyor can run both lines from this corner." The deeds and the surveyor were equally accessible to both parties. It is evident that the defendant had an equal and convenient means of acquiring accurate information as to the true location of the land lines of the plaintiff. The northeast corner

of the property was not described as defined by an iron stob, but was a point 19.15 chains east of a fixed point and 45 chains north of another fixed point. The number of acres in the entire tract was definite, and the boundaries could have been accurately determined by the means suggested by the plaintiff. To rely on information, even if authorized by the plaintiff, did not amount to an estoppel. Under such circumstances it was error to charge the jury that they could so find. In Combs v. Cooper, 5 Minn. 254, it was said: "In order to constitute an estoppel in pais against the legal owner of real estate, by reason of his voluntary representations in regard to a boundary line, it should appear that the party sought to be estopped must have been guilty of constructive fraud or gross neglect in regard to the subject-matter claimed as an estoppel, in order to conclude him from asserting the fact as it really exists. Or, in other words, there must have been an express design that the act or statement should influence the action of another." In Moore v. Lumber Co., 82 Ark. 485 (102 S. W. 385), it was held: "Where the agent of a landowner pointed out the supposed dividing line of the land to the adjacent proprietor, who thereupon cut timber therefrom up to such line, the landowner will not be estopped to recover for timber cut up to his true line if there was no purchase of land or timber based upon the statement of such agent."

In Cheeney v. Nebraska &c. Stone Co., 41 Fed. 740, it appeared that plaintiff and defendant owned adjoining tracts of land. Action was brought by the plaintiff for the value of stone taken off his land. The action was brought on May 14, 1889. The alleged trespass occurred between April 1, 1889, and the bringing of the action. At the time the quarry from which stone was taken was opened, the plaintiff was in the employment of the defendant, but was not so employed at the time of the alleged trespass. At the time the quarry was opened, inquiry was made of the plaintiff as to the boundary line between his land and defendant's land. The plaintiff pointed out a line, "blazed upon trees in the locality, which was then thought to be the true line by all the parties." "It does not appear by whom this line was run, or that plaintiff had any better knowledge of it than the officers and agents of the defendant, and other persons in the neighborhood." It was thereafter discovered that the greater part of the quarry opened by the defendant was on the plaintiff's land. The action is brought to

recover the value of stone taken from the quarry by the defendant after the true line between the tracts owned by the parties had been surveyed. The court said: "At the trial defendant contended that, inasmuch as the quarry was first opened on plaintiff's land, under the circumstances stated, at an expense to defendants of about $700, plaintiff was estopped to claim any stone at that time uncovered; and as all the stone taken by defendant between the dates named was so uncovered, with knowledge and consent of the plaintiff, before the survey was made, there was no right of action. In this, however, there is nothing on which to found an estoppel. It does not appear that plaintiff had any better knowledge of the line than defendant. He accepted the line marked by some one, we know not whom, and pointed it out to defendant; but there is nothing to show that he intended to mislead or deceive, or that there was in his conduct anything more than a mistake of fact. Mr. Bigelow says (4th ed. 596): 'The principles upon which these cases proceed is that there must have been, when the incorrect line was acted upon, knowledge of the true boundary by the one party, and ignorance of it by the other, in order to estop the party from asserting it within the period of limitations; and this although it may have been intended that the incorrect line should be fixed upon as the true one, and acted on accordingly; and this too it is held, although the admission was in writing, providing the instrument did not operate as a conveyance." In Evans v. Miller, 58 Miss. 120 (38 Am. R. 313), the court held: "E. forbade M. to cut any trees on his land, and pointed out to M. what he supposed to be the boundary line between their lands. M. proceeded to cut timber within the boundary of his own land as indicated by E. But, after the timber had been cut and used by M., the lands were surveyed, and it was ascertained that the trees had been felled on E.'s land. E. then sued for the value of his trees, and the circuit court instructed the jury in effect that he could not recover, because he had consented to the cutting of his trees. *Held,* that E. did not consent to the cutting, and his mistake as to the boundary did not deprive him of his right to compensation for his trees; but he can only recover their actual value, to be ascertained upon the basis most favorable to M., who took them through a mistake, into which he was partly led by E." In its opinion the court said: "Evans did not consent to the felling

of his trees. On the contrary, he distinctly forbade Miller's employees to trespass beyond what he supposed to be the true line. That he was mistaken as to where the line was, no more deprived him of the right to claim compensation for his trees than to claim ownership in the soil from which they were taken. Consent given to the taking, or acquiescence in the taking, of that to which one supposes that he has no title, will not prevent a recovery of the thing taken, when the true title is subsequently discovered."

The above authorities fully set forth our views on the present case. We do not think that the plaintiff is estopped to recover the value of his trees cut by the defendant. It does not appear that he was guilty of any fraud in the matter, or that he was guilty of gross neglect. It can not be that the plaintiff was bound to be at the expense of an actual survey, in order that he might be certain in a case of this character of making no errors in his statements in regard to the boundaries. It is true that he was not bound to give the information he did, or to make any statement in reference to the matter; but it is equally true that the defendant was not obliged to seek it of him. The sources of obtaining correct information on the subject were equally open to both, and the defendant could have ascertained the exact boundary, at the same expense, and as readily as could the plaintiffs. The deeds were apparently on record, and a survey could be made in accordance therewith. Clearly, no greater negligence can be attributed to the plaintiff than to the defendant; and if the latter chose to rely on such knowledge as the former possessed, rather than resort to the legitimate business method of ascertaining the true location of the premises, he must run his own risk as to the correctness of his information, so long as the entire good faith of the plaintiff in the transaction stands unimpeached. From what we have said we think the judge erred in his charge to the jury. The decision in *Wrightsville & Tennille R. Co.* v. *Holmes,* 85 *Ga.* 668 (11 S. E. 658), cited by the judge in his order overruling the motion for new trial, is clearly not authority for the charge given to the jury. In that case it was merely held that "a director of a railroad company who participated in the location of the road (by which location the damages complained of are alleged to have accrued), and afterwards purchased the land, would not be entitled to recover such damages," which is an entirely different case from that here

presented. The judge erred in overruling the motion for new trial. *Judgment reversed. Broyles, C. J., and MacIntyre, J., concur.*